## Reynolds v. Rolinson et al.

*Workmen's compensation—Death in course of employment—Coal miner— Black damp—Epilepsy—Going into forbidden part of mine—Misdemeanor— Act of June 9, 1911—Evidence—Opinion of expert.*

1. Where it is claimed that a coal miner died from black damp in the course of his employment, the opinion of a physician that he so died is properly received in evidence, although his conclusions are based wholly upon a statement of the history of the case and his personal investigation of the facts existing in the mine at the time of the miner's death.

2. In such case, the fact that the deceased had been subject to epilepsy and had had an attack immediately before he succumbed to the gas, will not defeat a recovery where it is shown that the gas was the efficient cause of his death.

3. Where a portion of a coal mine is blocked off on account of gas by a barrier marked dangerous, and a miner while engaged in his employment is attacked by epilepsy, and in crawling out to get the air, is overcome by the gas and dies therefrom, it cannot be charged that he had abandoned his employment and that the fatal injury which resulted therefrom was not suffered in the course of his employment; and this is the case, although he knew of the prohibited part of the mine, which he inadvertently entered and in which he was overcome by the gas.

4. Nor, in such case, can it be alleged that the death occurred while he was committing a misdemeanor in violating the Act of June 9, 1911, P. L. 756.

Appeal from decision of the Workmen's Compensation Board. C. P. Beaver Co., June T., 1925, No. 485.

*Samuel B. Wilson*, for plaintiff; *Daniel H. Stone*, for defendants.

READER, J.—The above entitled case comes before us on an appeal by the defendants from the decision of the Workmen's Compensation Board awarding compensation to Elizabeth Reynolds, the claimant, and her minor children.

The husband of Elizabeth Reynolds, James Reynolds, was a coal miner, and on July 11, 1924, he secured employment in the mine of the defendant, J. Rolinson, Sr., in the County of Beaver. He went to work at about seven o'clock on the evening of that day. He was accompanied into the mine by a man

named D. R. Bashaar. Bashaar was not an employee of the defendant, but apparently, under the evidence, went into the mine with Reynolds simply to accompany him. Reynolds, according to the evidence, started to work, and after he had been in the mine for a period of possibly twenty minutes was overtaken by sickness, referred to by the witness as "a spell," and apparently an attack in the nature of epilepsy, and, following this attack, fell down and started on his hands and knees to leave the mine. Bashaar was not able to keep up with him and missed him, and found when he had emerged from the mine that Reynolds was not outside. A search was later made and possibly about three-quarters of an hour from the time Reynolds went into the mine he was found in one of the workings of the mine lying on his face, dead.

The referee found that the death of Reynolds was caused by black damp, or carbon monoxide, in that part of the mine where he was found dead, and that his death was, therefore, due to the condition of the employer's premises. He also found that the accident thus causing his death occurred while Reynolds was in the course of his employment. The Workmen's Compensation Board approved the findings and conclusions of the referee and sustained his award. From this action of the board this appeal was taken.

Counsel for the defendants state three questions as being involved in the appeal, and as these questions state correctly the questions raised by the assignments of error, we consider and pass upon the case by taking up the questions as thus stated by counsel. The first question as stated by counsel is: (1) Is there competent medical evidence in the record to support the referee's finding of fact that Reynolds's death was due to an accident, i. e., due to exposue to black damp or carbon monoxide gas?

It is contended by the defendants that there is not sufficient evidence in the case to support the finding of the referee. In this position they rely upon the decision of the Supreme Court in the case of Fink v. Sheldon Axle and Spring Co., 270 Pa. 476, and the other cases in which a similar rule is stated, one of the latest of which is the case of McCoy v. Jones & Laughlin Steel Co., 275 Pa. 422, decided on an appeal from this court. In the Fink case the court said: "Both the courts and the administrative authorities have, very properly, been most liberal in construing the Workmen's Compensation Law, holding that claims thereunder need not be made out with the same exactness of proof required in suits at common law. It must be understood, however, that when, in cases of this class, expert testimony is relied on to show the connection between an alleged cause and a certain result, it is not enough for the doctors to say simply that the ailment in question might have resulted from the assigned cause, or that the one could have brought about the other; they must go further and testify at least that, taking into consideration all the attending data, it is their professional opinion the result in question most probably came from the cause alleged." This rule is well established by many cases decided under the Compensation Act as well as in many cases at law tried before the enactment of the Compensation Act. We cited a large number of these cases in our opinion in the McCoy case, at No. 149, September Term, 1921. There can be no question as to the rule; the only question in the instant case is as to whether it is applicable to the facts in the case as shown by the evidence.

The only medical testimony before the referee was that of Dr. H. C. McCarter, the Coroner of Beaver County. He testified that no autopsy was held, and that he based his conclusions as to the cause of death upon the history of the case and an investigation of the facts existing in the mine at the time of the death of Reynolds. He testified that he had stated the cause of death

Reynolds *v.* Rolinson et al.

as carbon monoxide poisoning, epilepsy being contributory. He stated that this conclusion was based upon the evidence or statements to the effect that he was found in a part of the mine known as a black damp area, where no one could have lived any length of time. He further stated that, in his opinion, the attack referred to generally as an attack of epilepsy would not have been fatal had Reynolds not gotten into the black damp area. He further testified that his father had been the physician of Reynolds for years, and that while he, the witness, had never seen Reynolds in an epileptic fit, he knew from his association with his father of the general condition of the man, and that, while he had frequent attacks of epilepsy, he was able to work with a fair degree of regularity.

It seems to us that the testimony of the doctor is not objectionable because of the fact that his conclusions are based wholly upon a statement of the history of the case and of the facts existing immediately at the time of the death of Reynolds. The record presents, in addition to the testimony of the doctor, considerable testimony of competent witnesses as to the experience of Reynolds during a number of years with reference to these attacks, and as to the actual condition in the mine at the time and place where Reynolds was found dead.

A witness, Fred Wolfe, testified that he had known Reynolds from the time he was five or six years old until the time of his death, and that Reynolds was aged about thirty-four years at the time of his death. He testified that he had been with Reynolds at times previous when he had had these spells or attacks. On such occasions he said he had seen him crawl away from the place he was working on his hands and knees. This witness also testified as to the condition of the mine at the time he and others recovered the body of Reynolds. He testified that one lying on his face in this part of the mine where Reynolds was found, as Reynolds was lying, might be overcome and killed by not more than a half dozen breaths of the black damp. According to the testimony of Wolfe, Reynolds was dead when he first saw him lying on his face in the mine, and the damp was so strong that Wolfe himself had to leave the place where Reynolds was for a time, as he himself was being affected by the damp.

Another witness, Samuel Bissell, testified also to having seen Reynolds when taken with these attacks, and having seen him on at least one occasion when so affected while working in a coal mine. He said the effect of it was to make him nervous and sick and that he attempted to get out of the mine by crawling on his hands and knees. He further testified that when under these spells Reynolds tried to get out into the fresh air, and that he would at times just roam around. He said that these spells would last from ten to fifteen minutes, and that he would be able, after they passed, to continue his work. This witness testified that he went into the mine with Reynolds (Bissell being one of the employees at the mine) to show him the place where he was to work, and that the body was found about three-quarters of an hour after Reynolds had gone into the mine. This witness testified that Reynolds had had these spells practically all of his life. Mr. Bissell also testified that he and Mr. Rolinson found Reynolds lying face down in the mine. They went out of the mine and were joined by Mr. Wolfe, and went back into the mine and removed the body. He testified that at the place where Reynolds was found the black damp was quite noticeable; that it made him dizzy and sick.

Mrs. Reynolds, the wife of the deceased, testified that he had suffered from these attacks so long as she had known him; that sometimes he would have one or two a week and then none for several weeks. She testified that the spells lasted for only a few minutes at a time.

Reynolds v. Rolinson et al.

Mr. D. F. Bashaar testified that he went into the mine with Reynolds on the evening of July 11, 1924, when he went to work. He testified that Reynolds started to work and worked about twenty minutes digging coal, when he was overtaken by an attack or spell. He said that Reynolds started on his hands and knees to get to the outside; that the witness asked him where he was going, and he said he was going out. This witness also testified that he had been with Reynolds in mines before this time and had seen him when suffering such an attack, and that when the attack was upon him, he would get flighty and start to wander, trying to get outside into the open air. Bashaar testified that on this occasion Reynolds passed him and he followed, but that his light was nearly out and he could not keep up with Reynolds and lost him, and when he himself had reached the outside he found that Reynolds had not yet come out; at any rate, he was unable to find him on the outside. This witness also testified that usually these attacks would pass in about ten or fifteen minutes and Reynolds would be able to resume his work.

Mr. Rolinson, one of the defendants and owner of the mine, testified as to having gone into the mine with Bissell and Wolfe in search of Reynolds and as to finding him lying on his face, dead. He said that there was damp at the bottom of the entry where he was found; that he was lying with his face down and "it drove all that damp into him; even if the fit would not take any effect upon him, the damp would." He also testified that there was so much black damp there at the time that he had to leave to escape from it before removing the body of Reynolds. He and Bissell, who had gone in together, had to leave the mine and re-enter later when Mr. Wolfe came up. Mr. Rolinson testified, further, that he had been engaged in the mining business from the time he was eleven years old, and was quite familiar with the effect of the black damp, and that it would kill one exposed to it. He stated that, in his opinion, if one were to lie down in this entry with his face to the ground and be there for any considerable time, it would cause death.

From this summary of the testimony relating to the condition of Reynolds with reference to these attacks of epilepsy over a considerable period of years; as to the general duration of these attacks and his recovery from them; as to his conduct in the mine on the occasion of the attack which preceded his death, and as to the condition of the entry in which he was found as to black damp, we think there was abundant evidence, when taken in connection with that of Dr. McCarter, to justify a finding that Reynolds, while suffering an attack of epilepsy, attempted to escape from the mine and to reach the fresh air, and while doing so found his way into the entry containing the black damp, and was there overcome by the black damp and died from the effects of the damp, or carbon monoxide: Cameron v. Banks Coal Co., 5 Pa. Workmen's Comp. Bd. Dec. 118; Clark v. Lehigh Valley Coal Co., 264 Pa. 529.

Nor is the award of compensation barred by the fact that the epileptic condition of the deceased may have contributed to his death by carbon monoxide gas, either by bringing about a condition in which it was difficult for him to make his way out of the mine, and by reason of which he became confused and found his way into the gaseous entry, or by rendering him incapable of escaping from that entry when he began to feel the effects of the carbon monoxide gas. The rule governing such a situation is thus stated in the case of Clark v. Lehigh Valley Coal Co., 264 Pa. 529: "If death comes, during the course of employment, in an ordinary way, natural to the progress of a disease with which one is afflicted, and with which he was smitten before the accident, there can be no recovery (McCauley v. Imperial Co., supra, page 327; Lane v. Horn & Hardart Co., supra, page 333); but if the demise is brought

about by an injury due to some mishap, or accident, happening during the course of his employment, the fact that deceased had a chronic ailment which rendered him more susceptible to such injury than an ordinary person would be will not defeat the right to compensation."

We are of the opinion, therefore, that the decision of the Workmen's Compensation Board should not be reversed on the ground stated in the first question presented by the defendants.

The second question stated by counsel for the defendants is: (2) Is the conclusion of law of the referee, as approved by the board, that Reynolds died as the result of injuries sustained by an accident in the course of his employment with the defendant supported by the evidence?

The defendants contend that Reynolds did not suffer the fatal accident while in the course of his employment with the defendants. The evidence clearly establishes the fact that, after entering the mine, Reynolds was actually at work in the mining of coal. This appears from the evidence of Rolinson (page 23), Bissell (pages 30-31) and Bashaar (page 48). It also appears from the evidence that the entry in which the body of Reynolds was found was a closed-off entry, and that the place where the body was found was from 500 to 600 feet from the place where he had been working. The entry had been closed off by placing across the opening of it a plank about two and one-half or three feet above the floor, the roof to this entry being about four and one-half feet high. Upon this barrier there was also a sign or notice of "Danger" (Rolinson, pages 19, 22, 23). The witness Bashaar also testified as to there being what he called a pole to keep people from going into this entry. Mr. Rolinson also testified that Reynolds had worked in the mine in March of the same year and was familiar with the fact that there was damp in this entry.

Under this evidence, defendants contend that Reynolds had no right in the abandoned or closed-off entry, and that when he went there his employment terminated, and the fatal injury which resulted was, therefore, not suffered in the course of his employment. In support of this position they cite the case of Walcofski v. Lehigh Valley Coal Co., 278 Pa. 84. In this case, gas having been discovered in a section of a coal mine, a mine foreman blocked the entrance with a board and marked on it "Gas," so as to warn workmen against entering that part of the mine; warning was also given to employees not to enter it, and a guard stationed at the entrance to prevent persons entering. It seems that the claimant was specially warned not to go in. When the foreman left, however, the claimant and another entered this section of the mine and attempted to light a fuse that would set off a charge of dynamite under the coal. The effect thereof was to cause an explosion and subject the claimant to severe injuries from burning. In passing upon this state of facts, the Supreme Court said:

"The question stated by appellant's counsel is whether compensation will be awarded to a person engaged in the commission of a crime. The inquiry might also be, 'Did the injury occur during the course of employment?' When the foreman discovered the gas and took steps to guard against danger, so much of the employer's mine containing gas ceased to be workable under the law. In the interest of life and safety, a barrier, at the opening, with notice and a guard, was required to be placed around such parts of the mine; work was thereafter, by law, suspended in that section. Neither the employer nor employee was permitted to enter for the purpose of digging coal so long as that part continued gaseous. The place, in law, was completely isolated. Any employee entering the prohibited ground severed his relation as a servant of

the master; he was no longer in the course of employment, but was a free agent, openly defying the statutes of the Commonwealth. The 'employee's presence thereon' was not 'required by the nature of his employment;' as to this danger zone, he had no employment.

"There can be no legal excuse for failure to obey an absolute statutory requirement: Jones *v*. American Caramel Co., 225 Pa. 644; Jaras *v*. Wright, 263 Pa. 486, 490. To sustain the act of claimant 'as at best contributory negligence,' which is no defence to a claim under the Workmen's Compensation Law, is to set up a quasi-legal excuse for the commission of a crime. The offence is not obliterated by the provision calling for punishment, nor by its enforcement. The law will not permit the offender, the penalty paid or unpaid, to otherwise reap substantial fruits from the crime. If we allow a recovery, we force the employer to pay the criminal for an illegal act which may bring death to many in its train."

A somewhat similar state of facts is presented in the case of Kuca *v*. Lehigh Valley Coal Co., 268 Pa. 163. In this case the man Kuca, on account of whose death compensation was claimed, had left his regular working place in the mine and had gone into another section which led him to an abandoned opening. He and a companion went into the abandoned opening and caused an explosion of gas. It appeared from the evidence that he was not called to this place by his business or duty, and that it was 500 feet distant from his proper working place. Upon these facts it was held that when he met death he was not engaged in the furtherance of the business or affairs of his employer, and compensation was refused.

The question for our consideration is as to the applicability of the rule established by the two cases cited to the facts involved in the present case. Section 301 of article III of the Workmen's Compensation Act of June 2, 1915, P. L. 738-9, in defining what constitutes an injury occurring in the course of employment, provides in part as follows: "The term 'injury by an accident in the course of his employment,' as used in this article, shall not include an injury caused by an act of a third person intended to injure the employee because of reasons personal to him, and not directed against him as an employee or because of his employment; but shall include all other injuries sustained while the employee is actually engaged in the furtherance of the business or affairs of the employer, whether upon the employer's premises or elsewhere, and shall include all injuries caused by the condition of the premises or by the operation of the employer's business or affairs thereon, sustained by the employee, who, though not so engaged, is injured upon the premises occupied by or under the control of the employer, or upon which the employer's business or affairs are being carried on, the employee's presence thereon being required by the nature of his employment."

In passing upon this provision of the statute, the Supreme Court, in the case of Callihan *v*. Montgomery, 272 Pa. 56, said: "The provision just quoted is broad enough to include every injury received on the premises of the employer during the hours of employment, so long as the nature of the employment demands the employee's presence there, regardless of whether his presence at the particular place where the injury occurred is actually required, if there is nothing to prove a virtual abandonment of the course of his employment by the injured person, or that, at the time of the accident, he was engaged in something wholly foreign thereto."

And later in the same opinion, on page 65, commenting upon the case of Kuca *v*. Lehigh Valley Coal Co., above cited, the court said: "It is true that in Kuca *v*. Lehigh Valley Coal Co., 268 Pa. 163, 167, compensation was

refused where the deceased deliberately left his regular working place and traveled some distance to another part of defendant's mine, entering an abandoned opening, where he caused an explosion of gas; but there the facts presented indicated that the injured man had voluntarily abandoned the course of his employment, whereas here, as previously pointed out, they indicated the contrary. We conclude that deceased was 'injured (and killed) by accident in the course of his employment,' in the sense of these words as used in the compensation law."

It is true that the Callihan case was decided upon another ground, and not upon the ground that Callihan was killed by accident in the course of his employment, although the court reaches this conclusion. It may, therefore, be said that this portion of the opinion is a *dictum* merely. If so, however, it is a very convincing *dictum*, and seems to us to indicate the distinction to be drawn in cases of this kind, and a distinction which we think exists between the two cases above cited, and relied upon by the defendants, and the instant case. That distinction, as stated in the Callihan case, seems to be that compensation should be refused where the evidence discloses the fact that the injured man had voluntarily abandoned the course of his employment; while, on the other hand, compensation may be allowed where it appears that, though the injured person is in a place where he ought not to be, and even where he is forbidden to go, his presence there does not indicate an abandonment of the course of his employment, but is consistent with the continuance of his employment. This distinction is illustrated by the case of Gurski v. Susquehanna Coal Co., 262 Pa. 1, relied upon by the claimant in the instant case. In this case the widow of Frank Gurski claimed compensation for the death of her husband. He was employed as a miner, and his death was caused by inhaling noxious gases which had accumulated in a portion of the defendant's mine. This part of the mine had been closed off and marked "Danger," and all workmen, including Gurski, had been notified not to enter it. Gurski had worked in this part of the mine before it was closed off and had left certain of his tools there. About two months later, while working in another part of the mine at a distance of 2600 feet from the gaseous part of the mine, he had occasion to use some of the tools or machinery left by him in this part of the mine and went there for the purpose of obtaining these tools. On the very day of the accident he had been notified not to go into this part of the mine. Nevertheless, he went there in search of the tools and was overcome by the gas and died as a result of inhaling it. It was held that he was acting within the course of his employment, although in the abandoned and prohibited part of the mine, and that he was entitled to compensation. The court was apparently of the opinion that in going into the abandoned part of the mine to secure tools to be used in working in other parts of the mine where he was employed by the defendant, the deceased was still acting in the course of his employment and in the furtherance of the business of his employer.

This leads us to a consideration of what acts on the part of an employee taking him away from the scene of his immediate employment may yet be said to be in the course of his employment and not to constitute an abandonment of it. The best definition of the rule governing such conduct on the part of an employee that has come to our attention is that found in the case of Dzikowska v. Superior Steel Co., 259 Pa. 578. The deceased in this case, on account of whose death compensation was claimed, was employed by the defendant in its shipping room, loading steel upon a railroad car in company with other employees. All of the steel at hand had been loaded and they

were waiting for the arrival of other material to be loaded. The deceased wore an apron of burlap and had burlap wrapped around his arms for the purpose of protecting him in handling the steel, and much of this burlap was saturated with oil. He left the shipping room and went into a box car in order to smoke while waiting, and in striking a match upon his trousers the burlap apron caught fire. He was so severely burned that he died a few days later. Considering the evidence as to these facts, the court said: "What we regard as a sound statement of the principle involved appears in 1 Honnold on Workmen's Compensation, § 111, as follows. 'It cannot be said that the employment is broken by mere intervals of leisure, such as those taken for a meal. If an accident happened at such a time, there would be no break in the employment, even though the workman is paid by the hour for the time he is actually at work, especially where the accident occurs on the employer's premises or about his property, unless the workman is doing something that is wholly foreign to his employment. Acts of ministration by a servant to himself, such as quenching his thirst, relieving his hunger, protecting himself from excessive cold, performance of which while at work are reasonably necessary to his health and comfort, are incidents to his employment and acts of service therein within the Workmen's Compensation Acts, though they are only indirectly conducive to the purpose of the employment. Consequently, no break in the employment is caused by the mere fact that the workman is ministering to his personal comforts or necessities, as by warming himself, or seeking shelter, or by leaving his work to relieve nature, or to procure drink, refreshments, food or fresh air, or to rest in the shade.'"

The same rule was stated and applied in the case of Hale v. Savage Fire Brick Co., 75 Pa. Superior Ct. 454, and in the case of Blouss v. Delaware, Lackawanna & Western R. R. Co., 73 Pa. Superior Ct. 95. We also call attention to the following cases as throwing light upon the question now under consideration: Flucker v. Carnegie Steel Co., 263 Pa. 113; Knorr v. Central R. R. of New Jersey, 268 Pa. 172; Clark v. Lehigh Valley Coal Co., 264 Pa. 529; Cameron v. Banks Coal Co., 5 Pa. Workmen's Comp. Bd. Dec. 118; Tomassoni v. Penna. Coal Co., 7 Pa. Workmen's Comp. Bd. Dec. 466.

The testimony in the instant case, as briefly summarized in the early part of this opinion, shows that, immediately before being overtaken by sickness, Reynolds was engaged at the work for which he was employed upon the employer's premises. Becoming sick, he began to crawl upon his hands and knees in the direction of the entrance to the mine, stating to the witness Bashaar that he was going to leave the mine. This statement, being made at the very time of his movement towards the mine entrance, was a part of the *res gestæ*, and the testimony of Bashaar as to the statement thus made is competent evidence: Com. v. Palma, 268 Pa. 434. The deceased traveled some considerable distance towards the entrance to the mine and then, instead of making the turn which led to the entrance, made the turn which led into the closed part of the mine. The evidence also establishes the fact that on other occasions when suffering from such an attack, probably of epilepsy, the deceased had gone to the air and in a few minutes revived to such an extent as to be able to resume his work. It seems to us to be a legitimate inference from the evidence in the instant case that this was his intention, and that he was acting to this end immediately before the time of his death, and that his conduct in this respect did not indicate any intention on his part to abandon the course of his employment, but rather the contrary. And we think the evidence also justifies the inference that the deceased did not voluntarily enter the closed portion of the mine for the purpose of performing any act

there, but rather that, in his confusion, he mistook the entry to this portion of the mine for one leading him to the outer air, and traveled as far as he did in this gaseous entry for the purpose of reaching the exit from the mine. In all this, we see nothing to justify an inference that he had abandoned the course of his employment, or that he was not in the course of his employment at the time of the fatal injury.

The third question involved, as stated by counsel for the defendants, is: (3) Was Reynolds, by entering a gas-infected area in an old abandoned working, shut off from the rest of the mine by a barricade, thereby guilty of a crime within the meaning of the Act of June 9, 1911, art. v, § 5, and art. XXVI, § 2, P. L. 756, which would preclude a recovery by his widow and minor children under sixteen years of age?

In support of this position defendants call our attention to the provisions of the Act of June 9, 1911, P. L. 756, entitled "An act to provide for the health and safety of persons employed in and about the bituminous coal mines of Pennsylvania, and for the protection and preservation of property connected therewith." Section 2 of article VI of this act provides for the closing of all portions of mines containing explosive gas, or noxious gases, and for the fencing off of the openings to all such parts of such mines so that no person can enter therein. Section 5 of article V makes it a misdemeanor for any employee or other person to pass by any danger signal or barrier placed at the entrance to any portion of a mine; and section 2 of article XXVI of the act provides the penalty for the violation of any of the provisions or requirements thereof.

In connection with these statutory provisions defendants again call our attention to the decision in the case of Walcofski *v.* Lehigh Valley Coal Co., above cited and quoted, and argue that the entrance of Reynolds into the closed portion of the Rolinson mine was a violation of the provisions of the Act of 1911 and a misdemeanor under its terms, and that, by reason thereof and the decision referred to, his dependents are precluded from claiming compensation. We think, however, that both the Walcofski case and the Kuca case, above cited, are distinguished by their facts from the instant case. In both of these cases it appears that the person injured had gone voluntarily and intentionally into the prohibited part of the mine and not upon any duty connected with his employment. In the instant case we think the evidence justifies the inference that Reynolds entered the closed portion of the mine, not voluntarily or intentionally, but inadvertently and by accident. His purpose evidently was to get out of the mine, and his movements were directed to that end, and by accident, due to his condition, he made the wrong turn and entered the wrong portion of the mine.

There can, of course, be no question as to the legal rule stated by the court in the Walcofski case, to the effect that "there can be no legal excuse for failure to obey an absolute statutory requirement." There are many cases in which one may be convicted of a crime for the doing of an act prohibited without proof of criminal intent on his part: Com. *v.* Liberty Products Co., 84 Pa. Superior Ct. 473. Even in such cases, however, we take it that criminality would not attach to the doing of the prohibited act if it were not done voluntarily by the offender, but were the result of accident on his part. There is a distinction between the intention which constitutes criminal intent in the doing of the act and the intention to do the act itself without regard to its character. If the latter intention is not present and the act is accidentally or unconsciously done, it seems to us that it could not be characterized as criminal even under the stringent rule above referred to. Thus, in 16 Corpus

Juris, 77, it is said: "The doing of the inhibited act constitutes the crime, and the moral turpitude or purity of the motive by which it was prompted, and knowledge or ignorance of its criminal character, are immaterial circumstances on the question of guilt. Whether or not in a given case a statute is to be so construed is to be determined by the court by considering the subject-matter of the prohibition as well as the language of the statute, and thus ascertaining the intention of the legislature. Whatever may be the true construction of the statute when, with a knowledge of all the facts, one deliberately violates a positive law which he is presumed to know, he cannot be excused on the ground that he intended no wrong. But the rule applies only to unlawful acts which are voluntarily, and in that sense intentionally done."

We are of the opinion that, under the evidence, the conduct of Reynolds in entering the closed section of the mine was not of such criminal character as to bring him within the operation of the decision in the Walcofski case.

We conclude that the exceptions to the decision of the Workmen's Compensation Board, as stated in the second and third questions above quoted, cannot be sustained. We, therefore, affirm the decision of the Workmen's Compensation Board.

## Order.

Now, to wit, Aug. 4, 1925, after reading all of the testimony taken before the referee, and carefully considering the same as well as the rules of law applicable thereto, it is ordered, adjudged and decreed that the decision of the Workmen's Compensation Board in the above entitled case be affirmed, and that the appeal therefrom be dismissed, at the costs of the appellants.